**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

CUNEYT KUTLUCA and TANIQUA
BROWN, Individually and on behalf of all
others similarly situated,

      Plaintiffs,

          v.

PQ NEW YORK, INC., PQ OPERATIONS,
INC., PQ LICENSING S.A., PQ 933
BROADWAY, INC., PQ CENTRAL PARK
INC., and DOES 1-51,

      Defendants.

Case No. 1:16-cv-03070-VSB

---

## MEMORANDUM OF LAW IN SUPPORT OF MOTION TO COMPEL ARBITRATION AND DISMISS PLAINTIFFS' CLASS ACTION COMPLAINT

FOLEY & LARDNER LLP
Anne B. Sekel
90 Park Avenue
New York, NY 10016
212-682-7474
asekel@foley.com

Erin C. Horton
James M. Nicholas
Donald W. Schroeder
111 Huntington Avenue
Boston, MA 02199
617-342-4000
ehorton@foley.com
jnicholas@foley.com
dschroeder@foley.com

*Attorneys for Defendants PQ New York, Inc., PQ Operations, Inc., PQ 933 Broadway, Inc. and PQ Central Park, Inc.*

## TABLE OF CONTENTS

STATEMENT OF FACTS ...................................................................................... 1

    1.    Plaintiffs' Factual Allegations. .......................................................... 1

    2.    PQ's Relationship with TriNet................................................................ 2

    3.    Plaintiffs' Arbitration Agreements and Class Action Waivers.............................. 4

ARGUMENT ........................................................................................................ 7

    I.    THE VALID AND ENFORCEABLE ARBITRATION PROVISIONS
        MANDATE DISMISSAL OF THE CLASS ACTION COMPLAINT................. 7

        A.    Federal Law Strongly Favors The Enforcement Of Agreements To
            Arbitrate. ................................................................................ 7

        B.    The DRP Is Valid And Enforceable By PQ In This Matter........................ 7

            1.    Plaintiffs Agreed To The DRP's Terms......................................... 8

            2.    The DRP Applies To Plaintiffs' Claims Against PQ Under The
                FLSA And New York State Law. ................................................... 9

            3.    Plaintiffs' Statutory Claims Are Arbitrable. ................................. 11

        C.    PQ Has Not Waived Its Right To Seek Arbitration Of Plaintiffs' Claims.
            ............................................................................................. 12

    II.    EQUITY MANDATES DISMISSAL OF THE CLASS ACTION COMPLAINT.
        .................................................................................................. 14

CONCLUSION................................................................................................... 19

# **TABLE OF AUTHORITIES**

**Cases**                                                                                    **Page(s)**

*In re A2P AMS Antitrust Litigation*,
   972 F. Supp. 2d 465 (S.D.N.Y. 2013)....................................................................18

*Alliance Bernstein Inv. Research & Mgmt., Inc. v. Schaffran*,
   445 F.3d 121 (2d Cir. 2006)..................................................................................7

*Arciniaga v. Gen. Motors Corp.*,
   460 F.3d 231 (2d Cir. 2006)..................................................................................7

*Badinelli v. The Tuxedo Club*,
   15 CV 6273 (VB), 2016 WL 1703413 (S.D.N.Y. Apr. 25, 2016)...........................12

*Cargill Int'l S.A. v. M/T Pavel Dybenko*,
   991 F.2d 1012 (2d Cir. 1993)...............................................................................11

*Ciago v. Ameriquest Mortgage Co.*,
   295 F. Supp. 2d 324 (S.D.N.Y. 2003)......................................................10, 11, 12

*Dean Witter Reynolds, Inc. v. Byrd*,
   470 U.S. 213 (1985)..........................................................................................7, 8

*Genesco, Inc. v. T. Kakiuchi & Co.*,
   815 F.2d 840 (2d Cir. 1987)...........................................................................7, n.3

*Greene v. Subcontracting Concepts, LLC*,
   13 Civ. 01500 (AJN), 2014 WL 1087999 (S.D.N.Y. Mar. 19, 2014) ...............14, 16

*Holzer v. Mondadori*,
   No. 12 Civ. 5234 (NRB), 2013 WL 1104269 (S.D.N.Y. Mar. 14, 2013)................18

*Kramer v. Hammond*,
   943 F.2d 176 (2d Cir. 1991).......................................................................12, 13, 14

*Langford v. Hansen Tech., LLC*,
   Civil No. 14cv1870-CAB (BGS), 2014 U.S. Dist. LEXIS 184878 (S.D. Ca.
   Nov. 19, 2014) ................................................................................................10

*Leadertex, Inc. v. Morganton Dyeing & Finishing Corp.*,
   67 F.3d 20 (2d Cir. 1995) ..............................................................................12, 13

*Litvinov v. UnitedHealth Grp., Inc.*,
   No. 13-CV-8541 (KBF), 2014 WL 1054394 (S.D.N.Y. Mar. 10, 2014)..................................9

*Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*,
   460 U.S. 24 (1983) ...........................................................................................................9

*Ouedraogo v. A-1 Int'l Courier Serv., Inc.*,
   12 Civ. 5651 (AJN), 2014 WL 1172581 (S.D.N.Y. Mar. 21, 2014) ......................................15

*Patterson v. Raymours Furniture Co.*,
   96 F. Supp. 3d 71, 76 (S.D.N.Y. 2015)..................................................................................9

*PPG Indus., Inc. v. Webster Auto Parts, Inc.*,
   128 F.3d 103 (2d Cir. 1997)...............................................................................................13

*Ragone v. Atlantic Video*,
   595 F.3d 115 (2d Cir. 2010).................................................................................14, 15, 16, 17

*Ross v. Am. Express Co.*,
   478 F.3d 96 (2d Cir. 2007).........................................................................................14, 17

*Rush v. Oppenheimer & Co.*,
   779 F.2d 885 (2d Cir. 1985)...............................................................................................13

*Salzano v. Lace Entertainment, Inc.*,
   13 Civ. 5600 (LGS), 2014 WL 3583195 (S.D.N.Y. July 18, 2014) ......................................15

*Spear, Leeds & Kellogg v. Cent. Life Assurance Co.*,
   85 F.3d 21 (2d Cir. 1996) .................................................................................................11

*Stolt-Nielsen S.A. v. Animalfeeds Int'l Corp.*,
   559 U.S. 662 (2010).............................................................................................................7

*WorldCrisa Corp. v. Armstrong*,
   129 F. 3d 71 (2d Cir. 1997)..................................................................................................9

*Zelkind v. Flywheel Networks, Inc.*,
   Case No. 15-cv-03375-WHO, 2015 WL 9994623 (N.D. Ca. Oct. 16, 2015).........................10

**Statutes**

Federal Arbitration Act, 9 U.S.C. §§ 1 *et seq.* ..............................................................................7

**Other Authorities**

Fed. R. Civ. P. 12(b)(1).............................................................................................................1

Defendants PQ New York, Inc., PQ Operations, Inc., PQ 933 Broadway, Inc., and PQ Central Park, Inc. (collectively, "PQ" or "Defendants") respectfully submit this memorandum of law in support of their <u>Motion to Compel Arbitration and Dismiss Plaintiffs' Class Action Complaint</u> (the "Motion").  Cuneyt Kutluca and Taniqua Brown (together, "Plaintiffs") assert individual and class claims against PQ based on alleged federal and New York state law wage and hour violations.  Plaintiffs, however, each entered into an employment agreement with TriNet – PQ's licensed professional employer organization ("PEO") – that provides that all disputes arising out of or relating to their employment with PQ must be submitted to arbitration before the American Arbitration Association ("AAA") or Judicial Arbitration and Mediation Services, Inc. ("JAMS").  Plaintiffs also each agreed to waive their rights to bring any action as a class, collective, or representative action or to participate as a member in any such action.  Accordingly, Plaintiffs' Class Action Complaint should be dismissed in its entirety pursuant to Fed. R. Civ. P. 12(b)(1), and Plaintiffs should be compelled to submit their claims to arbitration before the AAA or JAMS on individual bases.

## STATEMENT OF FACTS

1. **Plaintiffs' Factual Allegations.**[1]

Plaintiffs allege that they are New York residents who formerly were employed at two of PQ's corporately-owned restaurants in New York City, New York as tipped servers.  (Class Action Complaint ("Compl."), ¶¶ 6-7).  Plaintiffs seek to bring their claims individually and in a representative capacity, alleging collective and class action claims on behalf of themselves and a purported class of similarly situated tipped servers who were subject to PQ's alleged unlawful

---

[1]     Solely for purposes of this motion, PQ accepts as true the allegations in the Class Action Complaint.

wage-offset policies, including using a "tip credit" and declining to pay for the cost of laundering required uniforms.  Plaintiffs further allege that PQ's wage-offset policies resulted in PQ failing to pay putative class members the federal and New York state minimum wage, unlawfully retaining the employees' earned tips, and failing to pay all earned overtime wages in violation of the federal Fair Labor Standards Act ("FLSA") and New York Labor Law ("NYLL").  (Compl., ¶¶ 36, 84).

Plaintiffs also purport to bring a New York state law class action on behalf of three other proposed classes:  the "Spread of Hours Class," "Wage Statements Class," and "Uniform Laundering Class."  (Compl., ¶84).  As grounds for the "Spread of Hours Class," Plaintiffs allege that a class of PQ tipped servers in New York state were impermissibly denied spread of hours compensation and that PQ failed to include spread of hours compensation in such employees' regular rates of pay, resulting in improperly reduced overtime premiums.  (Compl., ¶ 84).  The "Wage Statements Class" relies upon allegations that PQ failed to provide and update introductory and/or biweekly wage statements and failed to maintain records as required under the NYLL.  (*Id*.).  Finally, the bases for the "Uniform Laundering Class" are allegations that PQ failed to provide uniform maintenance pay as required under the NYLL and failed to include such payments in employees' regular rates of pay, again resulting in improperly reduced overtime premiums.  (*Id*.).

## 2.   **PQ's Relationship with TriNet.**

In December 2014, PQ entered into a customer service agreement ("CSA") with TriNet, whereby TriNet would provide PEO services to PQ.  (Gordon Decl., ¶ 2; Belloise Decl., ¶¶ 2, 3).  The CSA established a co-employer relationship between TriNet and PQ with respect to individuals hired to work at PQ's worksites.  (Gordon Decl., ¶ 2).  Under the CSA, PQ functions as the worksite employer, responsible for directing its employees' day-to-day work and

managing its worksites.  (*Id.*; Belloise Decl., Ex. A at § 1).  TriNet, for its part, provides services to PQ as a licensed PEO and functions as the employer of record for administrative purposes for the same PQ employees that PQ oversees on a day-to-day basis.  (Belloise Decl., Ex. A at § 1). TriNet's co-employer responsibilities include  processing payroll, sponsoring and administering benefits, and providing certain human resources and compliance services.  (Gordon Decl., ¶ 2).

In connection with and in furtherance of their co-employer relationship, TriNet and PQ work closely together on a number of matters, including payroll processing.  (Gordon Decl., ¶ 6). Employees track their working time using PQ's point of sales system, and the data is then exported to TriNet's timekeeping system, where PQ reviews it to ensure proper accounting of spread of hours pay, call-in pay, and overtime.  (*Id.*).  Ultimately, TriNet is responsible for calculating and applying blended rates and overtime rates, where applicable, calculating total pay, applying payroll deductions, and ensuring timely payment of wages in compliance with state and federal law.  (*Id.*).  TriNet also conducts various audits on the payroll data, including audits aimed to ensure that the tip credit is applied correctly.  (*Id.*).

TriNet utilizes an online environment called "TriNet Passport" to effectuate its PEO services for PQ and its workforce.  (Belloise Decl., ¶¶ 1, 8, 11).  To use TriNet Passport, worksite employees must first create a unique TriNet Passport password.  (Belloise Decl., ¶ 8). Upon entering this unique password for the first time, PQ's worksite employees must then review and accept the terms of TriNet's standard Terms and Conditions Agreement ("TCA") through the TriNet Passport system.  (Belloise Decl., ¶ 10).  Worksite employees are required to accept the terms of the TCA to access the Passport system, including a Form I-9 as well as all other individual benefits and payroll information.  (Belloise Decl., ¶¶ 10-11, 15).

3

3.    __Plaintiffs' Arbitration Agreements and Class Action Waivers.__

      As a condition of employment or continuing employment, and in order to use the TriNet

Passport secured online portal, all PQ employees – including Plaintiffs – must acknowledge

receipt and accept the terms of the TCA, which, in pertinent part, includes a broad agreement to

arbitrate all employment-related disputes and a waiver of class or collective action claims.

(Belloise Decl., ¶¶ 10-11, 15, Ex. A at Introductory Paragraph).  Section 1 of the TCA explains

to employees TriNet's PEO relationship with PQ and its status as a co-employer with PQ with

respect to all PQ employees, as follows:

> TriNet is a licensed professional employer organization ("PEO")
> headquartered in San Leandro, California.  If your relationship
> with TriNet is beginning because the company at which you work
> has become a TriNet customer, this means that your company has
> entered into a customer service agreement with TriNet to share
> certain employer responsibilities as co-employers.  This means
> TriNet will be your employer of record for administrative purposes
> and will process payroll, sponsor and administer benefits, and
> provide certain human resources services.  As your worksite
> employer, your company retains the responsibilities of directing
> your day-to-day work and managing its business affairs.

(Belloise Decl, Ex. A at § 1).  Section 3 provides greater detail concerning which co-employer –

TriNet or PQ – bears responsibility for functions related to payroll, such as accurate reporting of

hours worked, calculating overtime, setting pay rates, ensuring payment of minimum wage, *etc*.

(Belloise Decl, Ex. A at § 3).  In particular, sub-sections 3(d)(ii) and (iii) clarify that TriNet

remains responsible for ensuring payment of minimum wages to all PQ employees for hours

worked.  (*Id*.).

      Section 9 of the TCA sets forth a "Dispute Resolution Protocol" ("DRP") which calls for

arbitration of "any dispute arising out of or relating to your employment with TriNet," waives the

right to file or participate in a class or collective action (the "Class Action Waiver"), and further

provides that TriNet customers, such as PQ, may likewise enforce the DRP for their own benefit.

(Belloise Decl, Ex. A at § 9).  PQ relies upon the TriNet DRP, and does not maintain its own separate arbitration agreements with its employees.  (Gordon Decl.,¶ 9).    The DRP provides in relevant part as follows:

### a. How The DRP Applies

This DRP covers any dispute arising out of or relating to your employment with TriNet.  The Federal Arbitration Act applies to this DRP . . . **With only the exceptions described below, arbitration will replace going before a government agency or a court for a judge or jury trial.** [emphasis in original].
. . .

### d. How Arbitration Proceedings Are Conducted
. . .

**There will be no right or authority for any dispute to be brought, heard or arbitrated as a class, collective, representative or private attorney general action, or as a member in any purported class, collective, representative or private attorney general proceeding, including, without limitation, uncertified class actions ("Class Action Waiver"); provided, however, that you may opt out of the Class Action Waiver by clicking this box [ ] before you click below to acknowledge this TCA.** [emphasis in original]. . . TriNet (and, if applicable, any TriNet customer[2] interested in enforcing this DRP for its own benefit) retains the right to enforce this DRP and the Class Action Waiver under the Federal Arbitration Act and to seek dismissal of class, collective or representative actions.

During the arbitration each party will pay his, her or its own attorneys' fees, subject to any remedies to which that party may later be entitled under applicable law.  In all cases where the law requires it, TriNet (and, if applicable, any TriNet customer interested in enforcing this DRP for its own benefit) will pay the arbitrator's and arbitration fees.
. . .

---

[2]      The terms "TriNet customer" and "worksite employer" in the TCA are referring to PQ.

### f. Enforcement Of The DRP

This DRP is the full and complete agreement relating to arbitration as the means to resolve covered disputes between you and TriNet and between you and your worksite employer unless the DRP is waived by your worksite employer or superseded by other terms and conditions of your employment with your worksite employer.

**With respect to covered disputes, each party waives any rights under the law for a jury trial and agrees to arbitration in accordance with the terms of this DRP.** [emphasis in original].

(Belloise Decl., Ex. A at § 9).

Section 10 of the TCA explains how employees can accept the terms of the TCA (including the DRP) and what such acceptance means. Specifically, Section 10 states that "[b]y clicking below, I am acknowledging that I have read and understand the contents of this [TCA] (including but not limited to the DRP) . . . and that I agree to abide by the terms and conditions set forth above . . . ." (Belloise Decl., Ex. A at § 10). When viewing the TCA through the TriNet Passport platform, employees "click below" by clicking on a button on the computer screen marked "I Agree." (Belloise Decl., ¶ 15). The TCA screen also provides an option to reject the terms of the TCA by clicking a button marked "Reject." (*Id.*).

On December 28, 2014, Plaintiff Taniqua Brown entered TriNet Passport and acknowledged and accepted the terms of the TCA, including the above-quoted DRP and Class Action Waiver, by clicking the "I Accept" button. (Belloise Decl., ¶¶ 18, 21, 24). She did not opt out of the Class Action Waiver by clicking on the box provided. (Belloise Decl., ¶ 23, Ex. D). Similarly, on February 24, 2015, Plaintiff Cuneyt Kutluca, entered TriNet Passport and acknowledged and accepted the terms of the TCA, which included the above-quoted DRP and Class Action Waiver. (Belloise Decl., ¶¶ 17, 20, 24). Like Ms. Brown, he did not opt out of the Class Action Waiver by clicking on the box provided. (Belloise Decl., ¶ 23, Ex. C).

6

## ARGUMENT

I. **THE VALID AND ENFORCEABLE ARBITRATION PROVISIONS MANDATE DISMISSAL OF THE CLASS ACTION COMPLAINT.**

### A. Federal Law Strongly Favors The Enforcement Of Agreements To Arbitrate.

The enforcement and analysis of the DRP is governed by the Federal Arbitration Act, 9 U.S.C. §§ 1 *et seq.* ("FAA"), which was designed to "ensure judicial enforcement of privately made agreements to arbitrate" and manifests a strong federal policy in favor of arbitration as an alternative means of dispute resolution. *Dean Witter Reynolds, Inc. v. Byrd*, 470 U.S. 213, 219 (1985); *see Alliance Bernstein Inv. Research & Mgmt., Inc. v. Schaffran*, 445 F.3d 121, 125 (2d Cir. 2006); *Arciniaga v. Gen. Motors Corp.*, 460 F.3d 231, 234 (2d Cir. 2006). Under the FAA, a written agreement to arbitrate "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or equity for the revocation of any contract." 9 U.S.C. § 2. Likewise, as with any contract, the parties' intentions control. Accordingly, "[w]hether enforcing an agreement to arbitrate or construing an arbitration clause, courts and arbitrators must give effect to the contractual rights and expectations of the parties." *Stolt-Nielsen S.A. v. Animalfeeds Int'l Corp.*, 559 U.S. 662, 682 (2010) (internal quotations omitted).

### B. The DRP Is Valid And Enforceable By PQ In This Matter.

When determining whether to compel arbitration, courts typically consider: (1) whether an agreement to arbitrate exists; (2) the scope of the underlying arbitration agreement; and (3) whether Congress intended plaintiff's statutory claims to be non-arbitrable. *Genesco, Inc. v. T. Kakiuchi & Co.,* 815 F.2d 840, 844 (2d Cir. 1987).[3] The FAA "leaves no place for the exercise

---

[3] Under certain circumstances, a court may also consider whether to stay the balance of a civil proceeding pending arbitration, where not all claims raised in the proceeding are arbitrable. *Genesco*, 815 F.2d at 844. Here, however, the Court need not reach this issue because all of Plaintiffs' claims as alleged in the Class Action Complaint are subject to arbitration as set forth in the DRP.

of discretion by a district court, but instead mandates that district courts *shall* direct the parties to proceed to arbitration on issues as to which an arbitration agreement has been signed." *Dean Witter Reynolds, Inc.*, 470 U.S. at 218 (emphasis in original).  Here, Plaintiffs unquestionably agreed to arbitrate all claims arising out of or relating to their employment, including any claims for unpaid minimum wage, overtime, and other forms of compensation, and nothing in either the text or legislative history of the FLSA or NYLL indicates any legislative intent to render such claims non-arbitrable.

### 1.    *Plaintiffs Agreed To The DRP's Terms.*

When determining whether a valid agreement to arbitrate exists, the Court must abide by the strong federal policy favoring arbitration.  *Id.* at 217.  In this case, the DRP clearly and unequivocally expresses an intent to submit all claims between the parties to binding arbitration.  Specifically, the DRP states that "**arbitration will replace going before a government agency or a court for a judge or jury trial**."  (Belloise Decl., Ex. A at § 9(a)) (emphasis in original).  For the avoidance of doubt, the DRP further states that it "is the full and complete agreement relating to arbitration as the means to resolve covered disputes between [the employee] and TriNet and between [the employee] and [the employee's] worksite employer . . . . **With respect to covered disputes, each party waives any rights under the law for a jury trial and agrees to arbitration in accordance with the terms of the DRP**."  (Belloise Decl., Ex. A at § 9(f)) (emphasis in original).  Also included within Plaintiffs' agreement to arbitrate was an explicit Class Action Waiver, which provides that "**[t]here will be no right or authority for any dispute to be brought, heard or arbitrated as a class, collective, representative or private attorney general action, or as a member in any purported class, collective, representative or private attorney general proceeding, including, without limitation, uncertified class actions ('Class Action Waiver'); provided, however, that you may opt out of the Class**

**Action Waiver by clicking this box [] before you click below to acknowledge this TCA**." (Belloise Decl., Ex. A at § 9(d)) (emphasis in original).  Plaintiffs manifested their agreement to the DRP's terms, including the Class Action Waiver, by choosing not to check the box to opt out of the Class Action Waiver and by clicking the "I Accept" button to indicate that they "read and underst[ood] the contents of" the DRP and "agree[d] to abide by the terms and conditions" therein.  (Belloise Decl., ¶¶ 17-21, 23-24, Ex. A at § 10; Ex. D).

Plaintiffs' acknowledgements are sufficient to render the DRP legally binding.  *See Litvinov v. UnitedHealth Grp., Inc.*, No. 13-CV-8541 (KBF), 2014 WL 1054394, at *3 (S.D.N.Y. Mar. 10, 2014) (finding agreement to arbitrate where employee "electronically acknowledged that she received and reviewed the Arbitration Policy" of her employer).  Indeed, the FAA does not require a signed writing to support an enforceable agreement to arbitrate. *Patterson v. Raymours Furniture Co.*, 96 F. Supp. 3d 71, 76 (S.D.N.Y. 2015) (citing 9 U.S.C. §§ 2-4)).

### 2. *The DRP Applies To Plaintiffs' Claims Against PQ Under The FLSA And New York State Law.*

Courts have consistently held that "the existence of a broad agreement to arbitrate creates a presumption of arbitrability which is overcome only if it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute." *WorldCrisa Corp. v. Armstrong*, 129 F. 3d 71, 74 (2d Cir. 1997) (internal quotations omitted); *see also Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 24, 24-25 (1983) ("Any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration").  In this case, the Plaintiffs agreed to arbitrate **any** claims arising out of or related to their employment, with the exception of certain enumerated claims such as workers compensation, state disability insurance, and unemployment insurance benefits claims.  (Belloise

Decl., Ex. A at § 9(a)-(b).  The alleged failure to properly pay minimum wage, overtime, and

other compensation legally due to Plaintiffs – and the classes they purport to represent – falls

squarely within the scope of the DRP.  Indeed, it is axiomatic that claims under the FLSA and

NYLL constitute claims "arising out of or related to employment," which are precisely the kind

of claims Plaintiffs agreed to put before an arbitrator on an individual basis.  *See Ciago v.

Ameriquest Mortgage Co.*, 295 F. Supp. 2d 324, 331 (S.D.N.Y. 2003) (finding that arbitration

agreement covering all claims arising out of employment relationship was broad enough to cover

overtime claims under the FLSA and New York state law).

     Moreover, it is of no import that PQ is not a signatory to the DRP, as the agreement itself

covers disputes "between you and your worksite employer."  (Belloise Decl., Ex. A at § 9(f)).  In

fact, when other courts – including federal district courts in California – have reviewed the exact

TriNet DRP provisions at issue here, they have found the DRP to be valid and enforceable under

the FAA, even as to disputes with the non-signatory worksite employer.  *See Langford v. Hansen

Tech., LLC*, Civil No. 14cv1870-CAB (BGS), 2014 U.S. Dist. LEXIS 184878 (S.D. Ca. Nov. 19,

2014) (addressing identical TriNet DRP, finding agreement not unconscionable and compelling

arbitration between plaintiff and worksite employer); *see also Zelkind v. Flywheel Networks,

Inc.*, Case No. 15-cv-03375-WHO, 2015 WL 9994623 (N.D. Ca. Oct. 16, 2015) (addressing

same DRP provisions, noting DRP applied to worksite employer and compelling arbitration of

claims against worksite employer).

     Although no court has expressly relied upon PQ's status as a third party beneficiary of

the DRP in finding that the DRP applied to a non-signatory worksite employer, the non-

signatories' third party rights are necessarily implied.  "[T]he FAA requires the enforcement of

an arbitration agreement not just in favor of parties to the agreement, but also in favor of third

party beneficiaries." *Spear, Leeds & Kellogg v. Cent. Life Assurance Co.*, 85 F.3d 21, 27, 31 (2d Cir. 1996) (concluding "the insurance companies are entitled, as third-party beneficiaries of an arbitration agreement, to insist on arbitration").  To determine if a non-signatory is a third party beneficiary, courts examine whether "the parties to that contract intended to confer a benefit on [the non-signatory] when contracting."  *Cargill Int'l S.A. v. M/T Pavel Dybenko*, 991 F.2d 1012, 1019-20 (2d Cir. 1993) (internal quotations omitted).

Here, the DRP twice states that the TriNet "customer" (*i.e.*, PQ) may "enforce the DRP for its own benefit" and, therefore, "retains the right to enforce this DRP and the Class Action Waiver under the [FAA] and to seek dismissal of class, collective or representative actions." (Belloise Decl., Ex. A at § 9(d)).  The DRP also clearly provides that it is "the full and complete agreement relating to arbitration as the means to resolve covered disputes between you and TriNet **and between you and your worksite employer** . . . ."  (Belloise Decl., Ex. A at § 9(f)) (emphasis added).  By its own terms – terms to which Plaintiffs both assented by clicking "I Agree" – the DRP establishes PQ as an intended third party beneficiary.  Accordingly, PQ is entitled to the fruits of the contract, Plaintiffs must be compelled to arbitrate pursuant to the terms of the DRP, and this matter must be dismissed for lack of jurisdiction.

### 3.    *Plaintiffs' Statutory Claims Are Arbitrable.*

Neither federal nor state legislators have expressed any intent that FLSA or NYLL claims are inarbitrable.  Courts have uniformly held that Congress has not manifested an intent to preclude arbitration of FLSA claims and that such claims are subject to arbitration pursuant to valid arbitration agreements.  As the court stated in *Ciago*, there is no indication that "Congress intended to preclude compulsory arbitration of FLSA claims" nor is there "an 'inherent conflict between arbitration and the policies' underlying the FLSA."  295 F. Supp. 2d at 332 (*quoting Gilmer v. Interstate/Johnson Lane Corp.*, 500 U.S. 20, 26 (1991)).  Moreover, the inclusion of a

class action waiver in an agreement to arbitrate FLSA claims does not change this analysis.  In *Sutherland v. Ernst & Young LLP*, the Second Circuit Court of Appeals held that "the [FLSA] does not include a 'contrary congressional command' that prevents a class-action waiver provision in an arbitration agreement from being enforced by its terms."  726 F.3d 290, 299 (2d Cir. 2013).

As with their FLSA claims, Plaintiffs' NYLL claims also are arbitrable.  When similarly faced with parallel FLSA and NYLL claims, the *Sutherland* court succinctly explained:  "We need not address Sutherland's NYLL claim in this opinion because, in light of our conclusion that Sutherland's FLSA claim must proceed individually in arbitration pursuant to the [FAA], so too must her NYLL claim."  *Sutherland*, 726 F.3d at 292, n. 1; *see Ciago*, 295 F. Supp. 2d at 334 (holding overtime claims under NYLL arbitrable because "nothing in [the NYLL] indicate[s] that the state legislature intended to preclude compulsory arbitration of claims under those provisions").

In light of Plaintiffs' clear agreement to arbitrate, the DRP's broad provisions, and the lack of any legislative intent to vest the courts with exclusive jurisdiction over FLSA and NYLL claims, Plaintiffs' burden to show that the DRP is invalid or unenforceable in this matter is simply insurmountable.  *See Badinelli v. The Tuxedo Club*, 15 CV 6273 (VB), 2016 WL 1703413, at *3 (S.D.N.Y. Apr. 25, 2016) (explaining burden of invalidating arbitration agreement rests with party to agreement seeking to avoid arbitration).

### C.    <u>PQ Has Not Waived Its Right To Seek Arbitration Of Plaintiffs' Claims.</u>

Plaintiffs cannot show that PQ waived its right to enforce the DRP in this matter. Whether or not a party's pretrial conduct amounts to a waiver of arbitration "is decided in the context of the case, with a healthy regard for the policy of promoting arbitration."  *Leadertex, Inc. v. Morganton Dyeing & Finishing Corp.*, 67 F.3d 20, 25 (2d Cir. 1995) (*citing Kramer v.*

*Hammond*, 943 F.2d 176, 179 (2d Cir. 1991)); *see Rush v. Oppenheimer & Co.*, 779 F.2d 885,

887 (2d Cir. 1985) (explaining a waiver of arbitration "is not to be lightly inferred").   A court

will consider the amount of litigation, the time elapsed from the commencement of litigation to

the request for arbitration, and the proof of prejudice to the opposing party.  *Leadertex, Inc.*, 67

F.3d at 25 (*citing Com-Tech Assocs. v. Computer Assocs. Int'l, Inc.*, 938 F.2d 1574, 1576-77 (2d

Cir. 1991)).

     Here, the parties have engaged in little to no litigation and exchanged no discovery.

Plaintiffs filed their Class Action Complaint on April 25, 2016, just over three months ago.

*Compare Kramer*, 943 F.2d at 179 (finding party waived right to arbitration because it litigated

identical issues with same adversary to highest state courts in two jurisdictions over four-year

period); *PPG Indus., Inc. v. Webster Auto Parts, Inc.*, 128 F.3d 103, 109 (2d Cir. 1997) (finding

party waived right to arbitration of MA court action because it engaged in discovery and filed

substantive motions in "nearly identical" CT court action involving same parties).

     On this record, Plaintiffs may demonstrate no prejudice to their interests.  *See Kramer*,

943 F.2d at 179 (*citing Com-Tech*, 938 F.2d at 1576; *Rush*, 779 F.2d at 887-88) (explaining

prejudice can be substantive, such as when a party loses a motion on the merits and then attempts

to re-litigate the issue by invoking arbitration, or it can be found when a party waits too long to

invoke its right to arbitration, causing its adversary to incur unnecessary delay or expense).  This

holds true whether or not PQ opted not to seek enforcement of the DRP against other plaintiffs in

matters not now before the Court, as PQ's actions in unrelated matters with completely different

plaintiffs create no prejudice to the Plaintiffs in this case.  *Compare PPG Indus., Inc.*, 128 F.3d

at 109 (finding waiver where party litigated "nearly identical" case against same adversaries);

*Kramer*, 943 F.2d at 179 (finding waiver where party litigated the same issues against the same adversary in a different case).

## II.      EQUITY MANDATES DISMISSAL OF THE CLASS ACTION COMPLAINT.

Even if this Court finds that the DRP by its own terms does not apply to PQ (which it does), a finding that PQ is not a signatory to or third party beneficiary of the DRP should not relieve Plaintiffs of their obligations to submit their claims against PQ to arbitration.  To the contrary, equity demands that Plaintiffs be estopped from refusing to arbitrate with PQ as a non-signatory to the DRP.

The Second Circuit Court of Appeals has "recognized a number of common law principles of contract law that may allow non-signatories to enforce an arbitration agreement, including equitable estoppel."  *Ross v. Am. Express Co.*, 478 F.3d 96, 99 (2d Cir. 2007).  Under principles of estoppel, a non-signatory may compel a signatory to arbitrate a dispute "where a careful review of the 'relationship among the parties, the contracts they signed . . . , and the issues that had arisen' among them discloses that 'the issues the nonsignatory is seeking to resolve in arbitration are intertwined with the agreement that the estopped party has signed.'" *Ragone v. Atlantic Video*, 595 F.3d 115, 126-27 (2d Cir. 2010) (*quoting Choctaw Generation Ltd. P'ship v. Am. Home Assurance Co.*, 271 F.3d 403, 406 (2d Cir. 2001)).  Courts apply a two-part test to determine whether a party should be estopped from refusing to arbitrate claims, which considers:  (1) whether there is a "close relationship" between the signatory seeking to avoid arbitration and the non-signatory party seeking to compel it; and (2) whether the signatory's claims are "intertwined" with the underlying agreement, or whether they arise under the subject matter of the underlying agreement.  *Greene v. Subcontracting Concepts, LLC*, 13 Civ. 01500 (AJN), 2014 WL 1087999, at *3 (S.D.N.Y. Mar. 19, 2014) (*citing Sokol Holdings, Inc. v. BMB Munai, Inc.*, 542 F.3d 354, 358-59 (2d Cir. 2008)).

The employer-employee relationship between PQ and Plaintiffs is a well-established "close relationship" for purposes of an equitable estoppel analysis.  *See, e.g.*, *Ouedraogo v. A-1 Int'l Courier Serv., Inc.*, 12 Civ. 5651 (AJN), 2014 WL 1172581, at *5 (S.D.N.Y. Mar. 21, 2014) (in collective action for wages and overtime under FLSA and NYLL, finding sufficiently close relationship between non-signatory co-employer and plaintiffs to compel arbitration under terms agreed between plaintiffs and co-employer PEO); *Salzano v. Lace Entertainment, Inc.*, 13 Civ. 5600 (LGS), 2014 WL 3583195, at *5 (S.D.N.Y. July 18, 2014) (finding sufficiently close relationship to estop plaintiff from refusing to arbitrate with non-signatory to arbitration agreement where non-signatory "exercised substantial control over the functions of the . . . plaintiff").

In *Ragone*, for example, the Second Circuit specifically addressed the relationship between a co-employer and employee.  595 F.3d at 127-28.  There, the plaintiff was employed by AVI as a make-up artist, subject to her assent to an arbitration agreement with AVI.  *Id.* at 118.  As part of her job duties for AVI, the plaintiff provided  make-up services to AVI's client, ESPN.  ESPN provided day-to-day onsite supervision to the plaintiff, but was not a signatory to the arbitration agreement with AVI.  *Id.* at 119.  When the plaintiff sued for sexual harassment, ESPN sought to enforce the arbitration agreement for its own benefit.  In holding that the plaintiff must submit to arbitration with ESPN, the *Ragone* court reasoned as follows:

> Ragone admits that she knew from the date of her employment by AVI that she would work with and be supervised by ESPN personnel in the ordinary course of her daily duties.  This knowledge that she would extensively treat [sic] with ESPN personnel is sufficient to demonstrate the existence of a relationship between Ragone and ESPN that allows the latter to avail itself of the arbitration agreement between Ragone and AVI.  Accordingly, . . . Ragone is properly estopped from avoiding arbitration with ESPN.

*Id.* at 128.

The "close relationship" between co-employers also is recognized in the context of wage and hour claims.  In *Greene*, a putative class action in which plaintiff employees alleged failure to pay minimum wage and overtime under the FLSA and NYLL, the court took a similar approach to the *Ragone* court in its decision to compel arbitration with a non-signatory.  2014 WL 1087999, at *4.  There, the plaintiffs worked as couriers for Same Day Delivery ("SDD"), a courier service.  *Id.* at *1.  Same Day Delivery had entered into an agreement with Subcontracting Concepts, LLC ("SCI"), under which SCI was to provide payroll processing and other back office services to SDD.  *Id.*  As part of its back office services, SCI required all SDD couriers to sign an "Owner/Operator Agreement," which contained an agreement to arbitrate employment disputes.  *Id.*  SDD was not a signatory to the Owner/Operator Agreement, but was a co-employer of the couriers, and was responsible for setting schedules, wage rates, and payroll policies.  *Id.*  The *Greene* court, citing *Ragone*, rejected the argument that estoppel was inappropriate because SDD and SCI lacked a "corporate relationship."  2014 WL 1087999, at *4.  Instead, the court held that SDD could enforce the arbitration agreement for its own benefit under estoppel principles because SDD and SCI were the plaintiffs' co-employers.  *Id.*

Against this backdrop, principles of equitable estoppel prevent Plaintiffs from avoiding arbitration with PQ.  Plaintiffs understood PQ to be their employer.  The very first paragraph in the Class Action Complaint alleges that they "are former tipped Servers employed at Defendants' corporately owned Le Pain Quotidien restaurants."  (Compl., ¶1).  In addition, Section 1 of the TCA clearly states that TriNet and Plaintiffs' "worksite employer" (*i.e.*, PQ) are co-employers and that PQ will direct Plaintiffs' day-to-day activities.  (Belloise Decl., Ex. A at § 1).  PQ is, in fact, repeatedly referenced in the DRP, which explicitly states, "This DRP is the

16

full and complete agreement relating to arbitration as the means to resolve covered disputes between you and TriNet and between you and your worksite employer. . . ."  (Belloise Decl., Ex. A at § 9(f)).  *Compare Ross*, 547 F.3d at 148 (declining to compel arbitration under estoppel theory where non-signatory had no duties to perform under and was not mentioned in underlying agreement).  As stated in *Ragone*, Plaintiffs' knowledge that PQ would be responsible for supervising their daily duties, "is sufficient to demonstrate the existence of a relationship between [Plaintiffs] and [PQ] that allows the latter to avail itself of the arbitration agreement." *Ragone*, 595 F.3d at 128.  Further, because TriNet and PQ work closely together on payroll processing and TriNet is ultimately responsible for calculating and applying blended rates and overtime rates, calculating total pay, applying payroll deductions, and ensuring timely payment of wages in compliance with state and federal law, for purposes of this wage and hour litigation, it is nearly impossible to untangle the two co-employers.  (Gordon Decl., ¶ 6).

Plaintiffs' FLSA and NYLL claims for unpaid wages, including minimum wage and overtime, also are sufficiently "intertwined" with the TCA to justify estoppel.  In substance, the TCA explains the responsibilities of PQ and TriNet as co-employers and sets forth the responsibilities of the "worksite employer" (*i.e.*, PQ), including "accurate reporting of hours worked, requisite break periods, overtime, and related matters."  (Belloise Decl., Ex. A at § 3(a)). The TCA is, in fact, the only document that provides this information to PQ's employees; PQ does not maintain its own separate agreement, and relies upon TriNet, as its PEO, to secure DRPs with each of its worksite employees.  (Gordon Decl,¶ 9).  Indeed, the Class Action Complaint alleges a litany of failures by PQ to fulfill the very responsibilities enumerated in the TCA.

Likewise, the TCA reinforces that TriNet, as a co-employer, remains at all times responsible for ensuring payment of minimum wages to Plaintiffs.  (Belloise Decl, Ex. A at § 3(d)(ii)-(iii)).  The Class Action Complaint alleges failure to pay minimum wages under the FLSA and NYLL, claims which necessarily require reference to TriNet's responsibilities as a co-employer.  *See Holzer v. Mondadori*, No. 12 Civ. 5234 (NRB), 2013 WL 1104269, at \*13 (S.D.N.Y. Mar. 14, 2013) ("signatories have thus been estopped from avoiding arbitration of claims against a non-signatory when they could have brought the same claims against the other signatory").

Finally, the TCA provides that each worksite employee's "acknowledgement and acceptance of this TCA is a condition not only of [his or her] use of TriNet's HR Passport and online services but also of [his or her] employment and/or continued employment with TriNet." (Belloise Decl., Ex. A at Introductory Paragraph).  Thus, agreement to the DRP and employment with PQ are inextricably linked.  The Southern District of New York addressed a similar scenario in *In re A2P AMS Antitrust Litigation*, 972 F. Supp. 2d 465 (S.D.N.Y. 2013).  There, the court allowed defendant cellular carriers to enforce an arbitration provision in a lease agreement to which they were not parties, reasoning  that "the very term Plaintiffs conscript to describe themselves and the putative class members—'CSC Lessees'—. . . is premised upon the relationships entered into through the [lease agreement] and is a status only conferred to those who have assented to the terms of the agreement."  *In re A2P AMS Antitrust Litig.*, 972 F. Supp. 2d at 477.  Just as the status of the *A2P* class of plaintiff lessees was contingent upon assent to the lease agreement, so too is the status of Plaintiffs as PQ employees contingent upon assent to the TCA.  It follows that, Plaintiffs' claims are inexorably tied to the subject matter of the TCA.

Given the close co-employer relationship between Plaintiffs and PQ and the connection between Plaintiffs' wage and hour claims and the subject matter of the TCA, the Court should compel Plaintiffs to abide by the terms of their valid and enforceable arbitration agreement and submit their claims against PQ to binding arbitration before the AAA or JAMS.

## <u>CONCLUSION</u>

For all the foregoing reasons, Defendants respectfully request that this Court dismiss Plaintiffs' Class Action Complaint in its entirety and compel arbitration.

Dated:  August 3, 2016                          Respectfully submitted,


                                                s/ Anne B. Sekel
                                                ─────────────────────────────
                                                Anne B. Sekel
                                                FOLEY & LARDNER LLP
                                                90 Park Avenue
                                                New York, NY 10016
                                                Telephone: 212-682-7474
                                                Fax: 212-687-2329
                                                asekel@foley.com

                                                *Attorneys for Defendants PQ New York, Inc.,*
                                                *PQ Operations, Inc., PQ 933 Broadway, Inc.*
                                                *and PQ Central Park, Inc.*

Erin C. Horton
James M. Nicholas
Donald W. Schroeder
FOLEY & LARDNER LLP
111 Huntington Avenue
Boston, MA 02199
Telephone: 617-342-4000
Fax: 617-342-4001
ehorton@foley.com
jnicholas@foley.com
dschroeder@foley.com

*OF COUNSEL*